IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| FANTASHIA S. ROBINSON, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO. 3:12CV587-REP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Fantashia Robinson ("Plaintiff") is 33 years old and previously worked as a laundry worker and a cashier/checker. On July 13, 2009, Plaintiff applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act") with an alleged onset date of June 9, 2009, alleging disability coronary artery disease, chronic heart failure and depressive disorder. Plaintiff's claim was presented to an administrative law judge ("ALJ"), who denied Plaintiff's request for benefits. The Appeals Council subsequently denied Plaintiff's request for review on June 20, 2012.

Plaintiff now challenges the ALJ's denial of benefits, arguing that the ALJ improperly assigned less than controlling weight to the opinions of her treating physicians, applied the wrong legal standard when determining Plaintiff's credibility and relied upon flawed Vocational Expert ("VE") testimony in reaching his final decision. (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 7) at 12, 14, 17, 21.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C. § 405(g). This matter is now before the Court by consent of the parties pursuant to 28 U.S.C.

§ 636(c)(1) on Plaintiff's Motion for Summary Judgment and Motion to Remand (ECF Nos. 7 & 8) and Defendant's Motion for Summary Judgment (ECF No. 12).[1] For the reasons set forth herein, the Court recommends that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED; Plaintiff's Motion to Remand (EFC No. 8) be DENIED; Defendant's Motion for Summary Judgment (ECF No.12) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges whether the ALJ erred in assigning the opinions of the treating physicians less than controlling weight, whether the ALJ properly determined Plaintiff's credibility and whether the ALJ relied upon flawed VE testimony in reaching his final decision. Therefore, Plaintiff's educational and work history, Plaintiff's medical history, Plaintiff's non-treating state agency physician opinion, Plaintiff's reported activities of daily living, Plaintiff's hearing testimony, third party functioning report and vocational expert's testimony are summarized below.

A.     Plaintiff's Education and Work History

Plaintiff completed school through tenth grade. (R. at 105.) Plaintiff previously worked as a laundry worker and cashier/checker, where she took orders, cleaned clothes, lifted heavy items and interacted with customers. (R. at 30, 54-55.) Plaintiff indicated that she walked and

---

[1]     The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to properly analyze the case.

stood for eight hours each day. (R. at 309.) She frequently lifted 50 pounds. (R. at 309.)
Plaintiff stopped working in November 2007 after she was fired and she has not worked since.
(R. at 308.)

     B.     Plaintiff's Medical Records

          1.     Plaintiff's Cardiac Treatment

On June 24, 2009, Plaintiff was diagnosed with shortness of breath after she went to the
emergency room complaining of shortness of breath and tightness in her chest. (R. at 435-36.)
On July 8, 2009, Plaintiff returned to the hospital complaining of increased chest pain. (R. at
443.) Doctors conducted a stress test, which returned abnormal results. (R. at 444.) After
further testing revealed left main coronary artery disease, Plaintiff underwent a double coronary
artery bypass graft on July 16, 2009. (R. at 474-76.) Plaintiff was discharged on July 20, 2009.
(R. at 444.) Plaintiff returned to the emergency room on July 25, 2009, complaining of chest
pain. (R. at 428.) Doctors diagnosed chest pain, prescribed Percocet and advised Plaintiff to
return if the pain worsened. (R. at 431-32.) On August 7, 2009, Plaintiff complained of chest
pain and was diagnosed with coronary artery disease status post-coronary artery bypass grafting.
(R. at 599-600.)

On September 11, 2009, Plaintiff visited Michael E. Kelly, M.D., upon referral from
Plaintiff's surgeon following Plaintiff's artery bypass graft. (R. at 604.) Dr. Kelly found
Plaintiff's "surgical recovery was unremarkable," noting that Plaintiff slept well without any
unusual fatigue or recurrence of shortness of breath and chest pain. (R. at 604.) Because
Plaintiff presented "severe multivessel coronary artery disease in a menstruating female without
diabetes, [whose] only apparent risk factor is minimal tobacco use," Dr. Kelly recommended

regular stress testing with nuclear imaging. (R. at 605.) At that time, Plaintiff was taking oxycodone for pain, Plavix and simvastatin to control her cholesterol levels, metoprol for hypertension, and Xanax to lower her anxiety. (R. at 605.)

Plaintiff attended a follow-up appointment with Dr. Kelly on November 6, 2009, during which Plaintiff reported a "sharp needle like substernal chest pain occurring mostly at rest and with emotional upset." (R. at 640.) Plaintiff attributed her stress to a brief incarceration, the death of her mother and her daughter's expulsion from school. (R. at 640.) Though she had been prescribed Wellbutrin to help her quit smoking, Plaintiff still smoked several cigarettes per day. (R. at 640.) Dr. Kelly noted that Plaintiff's chest discomfort pattern was "completely non-typical," and that Plaintiff's continued tobacco use and stressful lifestyle posed "suboptimal management of risk factors." (R. at 640.) Dr. Kelly recommended a trial of nitroglycerine and a nuclear stress test, and advised Plaintiff to go to the emergency room if her chest pain persisted. (R. at 641.)

On November 10, 2009, Dr. Kelley referred Plaintiff to Janie Orrington-Myers, D.O., to examine a chest wall mass on her right side. (R. at 717.) Dr. Orrington-Myers ordered a CT scan with contrast to evaluate the mass. (R. at 718.) On January 20, 2010, Dr. Orrington-Myers performed an excisional removal of the mass. (R. at 721.) Plaintiff recovered from this procedure without complication. (R. at 721.)

Plaintiff returned to Dr. Kelly for a follow-up appointment on November 13, 2009, complaining of chest discomfort. (R. at 639.) Dr. Kelly again recommended a nuclear stress test. (R. at 639.) In a stress test performed December 17, 2009, Plaintiff exercised for five minutes before complaining of severe left-sided chest pain. (R. at 645.) Plaintiff's

4

electrocardiographic response was unremarkable and no arrhythmias were noted. (R. at 645.)
The stress test achieved an inadequate heart rate for analysis (R. at 645.)

During Plaintiff's April 20, 2010 appointment with Dr. Kelly, Plaintiff reported that she
no longer experienced chest pain, but complained of shortness of breath both on exertion and at
rest. (R. at 730.) Plaintiff continued to take Plavix and aspirin. (R. at 730.) Plaintiff
complained of "intermittently disturbed" sleep due to "tremendous socioeconomic stress in her
home environment." (R. at 730.) Dr. Kelly noted that Dr. Orrington-Myers successfully
removed a mass from Plaintiff and no complications resulted from that procedure. (R. at 730.)
After conducting an unremarkable EKG, Dr. Kelly diagnosed Plaintiff with (1) coronary artery
disease status post-coronary artery bypass and recurrent chest pain without demonstrable
myocardial ischemia; (2) exertional and resting dyspnea possibly related to early chronic
obstructive pulmonary disease (COPD); (3) significant anxiety disorder with depression and
overwhelming social circumstances; (4) significant chronic pain syndrome, which was being
treated by Dr. Sinnatamby; and (5) dyslipidemia or high cholesterol. (R. at 730-31.) Dr. Kelly
advised Plaintiff to continue to take her medication. (R. at 731.)

During Plaintiff's December 7, 2010 appointment with Dr. Kelly, Plaintiff reported
recurrent bronchitis and chest pain radiating to the left shoulder, which she attributed to
emotional factors rather than exertion. (R. at 832.) Plaintiff continued to smoke cigarettes. (R.
at 832.) During the examination, Dr. Kelly noted slight bilateral wheezing. (R. at 832.) Plaintiff
underwent an EKG, which revealed no change from prior testing. (R. at 832.) Dr. Kelly opined
that Plaintiff suffered subjective chest pain in response to minimal activity, but the objective
findings were inconsistent with ischemia. (R. at 832.) However, Plaintiff's anxiety disorder

made it difficult to decipher the cause of Plaintiff's conditions. (R. at 832.) Dr. Kelly

recommended that Plaintiff continue her medications without any change in her therapy

treatment. (R. at 832.)

Dr. Kelly completed the Cardiac Impairment Questionnaire in which he diagnosed

Plaintiff with coronary artery disease, severe anxiety disorder and chest pain at low workload

rated as New York Heart Association class III.[2] (R. at 805-10.) He reported clinical findings of

chest pain, anginal equivalent pain, fatigue, and weakness. (R. at 805.) Dr. Kelly wrote that

Plaintiff suffered a "complete inability to continue exercise due to chest pain" — even at a low

heart rate and low blood pressure — and he listed Plaintiff's symptoms as "left sided chest pain

with minimal activity." (R. at 806.) Dr. Kelly indicated that Plaintiff experienced daily left-

sided chest pain radiating to the left shoulder that Plaintiff attributed to emotional difficulties,

physical exertion and cold weather. (R. at 806-07.) Dr. Kelly opined that Plaintiff's symptoms

would likely increase if she were placed in a competitive work environment. (R. at 807.) He

estimated that, during an eight-hour work day, Plaintiff could sit for three hours, stand or walk

for one hour, frequently lift and carry five pounds, and occasionally lift and carry five to ten

pounds. (R. at 807-08.) On average, Dr. Kelly estimated that Plaintiff was likely to be absent

from work as a result of her impairments or treatment more than three times a month. (R. at

808.)

---

[2]     A NYHA functional classification III denotes a patient "with cardiac disease
resulting in marked limitation of physical activity." *Classes of Heart Failure*, AM. HEART
ASS'N, http://www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/Classes-
of-Heart-Failure_UCM_306328_Article.jsp (last visited Apr. 5, 2013). Patients rated at NYHA
III "are comfortable at rest," but "less than ordinary activity causes fatigue, palpitation, dyspnea
or anginal pain." *Id.*

Dr. Kelly found that emotional and psychological factors contributed to the severity of Plaintiff's symptoms, specifically her "crippling anxiety disorder with multiple psychiatric medications" and that Plaintiff's pain, fatigue and other symptoms interfered with her attention and ability to concentrate. (R. at 808.) In Dr. Kelly's opinion, Plaintiff would be incapable of even "low stress" in a work situation. (R. at 808-09.) Dr. Kelly estimated that these limitations had been present since his first evaluation of Plaintiff on September 11, 2009. (R. at 809.)

On August 31, 2011, Plaintiff returned to Dr. Kelly with complaints of shortness of breath and chest pain that appeared to be exertional, but also seemed to be associated with emotional distress. (R. at 831.) Plaintiff reported that nitroglycerin had been helpful to ease the pain, but caused severe headaches. (R. at 831.) Dr. Kelly noted that Plaintiff still smoked one cigarette per day and that a "review of systems [was] otherwise remarkable only for many indications that she suffers from an extraordinarily [sic] level of anxiety." (R. at 831.) After conducting an EKG that returned no changed results from previous testing, Dr. Kelly noted that her pain sounded like recurrent angina and recommended a nuclear stress test. (R. at 831.)

During Plaintiff's December 27, 2011 appointment, Plaintiff "unexplainably [had] not obtain[ed] the stress test as ordered," so he reordered nuclear stress testing. (R. at 829.) He stated that Plaintiff's "most disabling condition is anxiety disorder," but without further testing it was difficult for him to comment on her cardiac issues. (R. at 829.) Following this visit, Dr. Kelly completed a second Cardiac Impairment Questionnaire and provided information consistent with the previous Questionnaire completed on December 7, 2011. (R. at 413-18.)

Plaintiff underwent a cardiac stress test on December 30, 2011, and exercised on a graded treadmill for eight minutes. (R. at 836.) Plaintiff reached a peak workload of 10.1 METS, but

7

did not achieve the target heart rate of 161. (R. at 836.) As a result, the test was deemed inadequate for diagnosis. (R. at 836.)

> 2.    Plaintiff's Treatment for Anxiety and Depression

On May 17, 2010, Plaintiff visited Shama Saiyed, M.D., a psychiatrist, complaining of increased depression, anxiety, hopelessness, helplessness, anger and difficulty sleeping since her coronary artery bypass grafting and the death of her mother. (R. at 795.) Plaintiff stated that she had never been hospitalized for anxiety or depression. (R. at 796.) Plaintiff appeared well groomed and demonstrated good eye contact and normal speech tone and rhythm. (R. at 797.) She admitted to Dr. Saiyed that she smoked marijuana every day since she was thirteen years old. (R. at 796.) Dr. Saiyed noted Plaintiff's depressed and restricted mood and affect, paranoia, poor memory, poor concentration, poor attention, poor calculations, poor abstract thinking, fair fund of knowledge, poor judgment and poor insight. (R. at 797.) Dr. Saiyed diagnosed Plaintiff with major depressive disorder recurrent and generalized anxiety disorder, so he prescribed Abilify and Pristiq for Plaintiff's treatment. (R. at 798.) Dr. Saiyed assigned Plaintiff a GAF score of 55. (R. at 798.)

On June 15, 2010, Plaintiff returned to Dr. Saiyed, reporting that she still felt depressed and anxious, but that her symptoms had improved. (R. at 799.) Dr. Saiyed continued Plaintiff's treatment with Abilify and Pristiq, while also prescribing Remeron. (R. at 799.) On July 15, 2010, Plaintiff visited Dr. Saiyed and exhibited no notable changes in her condition. (R. at 799). Dr. Saiyed added Seroquel to Plaintiff's medication treatment regimen. (R. at 799.)

During Plaintiff's August 19, 2010 appointment, Plaintiff reported that her symptoms continued to improve, but she still experienced sleep and appetite problems, which she attributed

to the anniversary of her mother's death. (R. at 803.) Dr. Saiyed continued treatment with Abilify, Pristiq and Remeron. (R. at 803.)

That same day, Dr. Saiyed completed a Psychiatric/Psychological Impairment Questionnaire in which she diagnosed Plaintiff with major depressive disorder with psychotic features, as well as generalized anxiety disorder. (R. at 785-86.) Dr. Saiyed indicated that Plaintiff's GAF registered at 50, but she did not know Plaintiff's highest GAF in the preceding year. (R. at 786.) Dr. Saiyed indicated that Plaintiff suffered poor memory, appetite disturbance with weight change, sleep disturbance, personality change, mood disturbance, recurrent panic attacks, anhedonia or pervasive loss of interests, psychomotor agitation, paranoia or inappropriate conspicuousness, feelings of guilt/worthlessness, difficulty thinking or concentrating, suicidal ideation or attempts, social withdrawal or isolation, decreased energy, obsessions or compulsions, persistent irrational fears, generalized persistent anxiety, hostility and irritability. (R. at 787.) Plaintiff's primary symptoms were listed as depression, anxiety, sleep problems, anhedonia, and not eating or drinking properly. (R. at 788.)

Dr. Saiyed opined that Plaintiff was mildly limited[3] in her ability to carry out simple one or two-step instructions and to carry out detailed instructions. (R. at 789.) Dr. Saiyed also opined that Plaintiff was moderately limited[4] in her ability to: (1) remember locations and work-like procedures, (2) understand and remember one or two step instructions, (3) understand and remember detailed instructions, (4) perform activities within a schedule, (5) maintain regular

---

[3]     The Questionnaire defined "mildly limited" as "does not significantly affect the individual's ability to perform the activity." (R. at 788.)

[4]     The Questionnaire defined "moderately limited" as "significantly affects but does not totally preclude the individual's ability to perform the activity." (R. at 788.)

attendance and be punctual, (6) sustain ordinary routine without supervision, (7) work in

coordination with or proximity to others without being distracted by them, (8) complete a normal

workweek without interruptions from psychologically-based symptoms and perform at a

consistent pace without an unreasonable number and length or rest periods, (9) ask simple

questions or request assistance, (10) accept instructions and respond appropriately to criticism

from supervisors, and (11) respond appropriately to changes in the work setting. (R. at 789-90.)

Dr. Saiyed finally opined that Plaintiff was markedly limited[5] in her ability to: (1) maintain

attention and concentration for extended periods, (2) make simple work related decisions, (3)

interact appropriately with the general public, (4) get along with co-workers or peers without

distracting them or exhibiting behavioral extreme, (5) maintain socially appropriate behavior and

adhere to basic standards of neatness and cleanliness, (6) be aware of normal hazards and take

appropriate precautions, (7) travel to unfamiliar places or use public transportation, and (8) set

realistic goals or make plans independently. (R. at 789-91.)

     Dr. Saiyed indicated that Plaintiff's impairments were ongoing and expected them to last

at least twelve months, but that Plaintiff was not a malingerer. (R. at 792.) Dr. Saiyed opined

that Plaintiff was incapable of tolerating even low stress and estimated that, on average, Plaintiff

was likely to be absent from work as a result of her impairments or treatment more than three

times a month. (R. at 792-93.)

     On January 19, 2011, Plaintiff returned to Dr. Saiyed and indicated that she stopped

taking her medications, because she felt better. (R. at 812.) Plaintiff reported continued issues

---

     [5]     The Questionnaire defined "markedly limited" as "effectively precludes the
individual from performing the activity in a meaningful manner." (R. at 789.)

with depression, sleep problems and mood disturbance. (R. at 812.) Dr. Saiyed prescribed a regimen of Seroquel, Remeron and Effexor for Plaintiff. (R. at 812.)

On February 2, 2011, Plaintiff returned and reported continued issues with both depression and anxiety. (R. at 813.) Dr. Saiyed continued her medication regimen of Seroqel, Remeron and Effexor. (R. at 813.) On March 29, 2011, Plaintiff reported that the Seroquel made her groggy during the day and that she was still stressed and panicky. (R. at 814.) The doctor increased her prescriptions for Effexor and Seroquel, added Klonopin, and continued the Remeron. (R. at 814.) During Plaintiff's April 26, 2011 appointment, Plaintiff reported increased irritability and that she had been experiencing mood swings. (R. at 814.) Plainitff noted that the Klonopin helped her condition, but she still experienced depression and anxiety. (R. at 814.) The doctor altered her dose of Seroquel and continued the other medications. (R. at 814.)

On May 24, 2011, Plaintiff reported an improvement in her condition and that she was sleeping better and feeling calmer. (R. at 822.) On June 21, 2011, Plaintiff indicated that her condition worsened significantly and she attributed it to the denial of her disability benefits and eviction from her apartment. (R. at 821.) She stated that, on June 3, 2011, she felt depressed, anxious, suicidal and went to the emergency room because of a panic attack. (R. at 821.) Dr. Saiyed recommended that Plaintiff go to the hospital immediately and follow up after her release. (R. at 821.)

On October 18, 2011, Plaintiff reported feeling upset due to an issue with her daughter. (R. at 821.) She stated that she was out of her medications and discussed her poor compliance with her treatment. (R. at 821.)

C. Plaintiff's Activities of Daily Living

On April 6, 2010, Plaintiff completed a function report in which she indicated that she spent her days reading a book or watching television. (R. at 364-72.) Plaintiff took care of her 13-year older daughter and lived with a roommate. (R. at 365-66.) Plaintiff complained that her condition limited her ability to cook, clean, work, sleep at night and dress herself, but she took showers, fed herself and used the toilet. (R. at 366.) Plaintiff indicated that she did not perform any housework or cook. (R. at 367.) Plaintiff went outside and would ride in a car, because she could not drive. (R. at 368.) She shopped in stores and online for food and clothes for about two and half hours. (R. at 368.)

Plaintiff indicated that she could count change, handle a saving account and use a checkbook, but she could not pay her bills because she could not work. (R. at 368.) Plaintiff went to the doctor's office on a regular basis and sometimes needed a reminder to take her medication. (R. at 367, 369.) She marked that her conditions affected her ability to lift, bend, stand, climb stairs and get along with others. (R. at 370.) However, her conditions did not affect her ability to squat, reach, walk, sit, kneel, talk, hear, see, remember, complete tasks, concentrate, understand, follow instructions or use her hands. (R. at 370.) Plaintiff could finish what she started and she was "alright" at following written and spoken instructions. (R. at 370.) While Plaintiff could not handle stress well, she indicated that she experienced no problem getting along with authority figures. (R. at 371.)

D. Plaintiff's Testimony

Plaintiff testified at a hearing before the ALJ on May 11, 2011. (R. at 78.) Plaintiff stated that at the time she was living with her daughter and a friend. (R. at 78.) She completed

the tenth grade and never received any vocational, skill, or trade training. (R. at 79.) Plaintiff testified that she had not worked, had not applied for a job, had not collected unemployment benefits or received any compensation for work-related injuries since June 1, 2009. (R. at 80-81.)

Plaintiff experienced daily pain in her legs. (R. at 82.) She estimated that she could lift or carry five pounds at a time, stand for five to ten minutes at a time, sit for no longer than thirty minutes before becoming uncomfortable and walk one to two blocks at a time. (R. at 83-84.) She maintained her ability to read, write and use a telephone. (R. at 85.) Plaintiff shopped for herself with other individuals, prepared simple meals for herself and her daughter, and did not require any help with her personal care. (R. at 85-86.) She smoked one cigarette per day. (R. at 88.)

Plaintiff testified that she experienced dizziness and vomiting daily as side effects from her medications. (R. at 87.) She also explained that she sometimes heard the voice of her deceased mother, which distracted her and caused her anxiety. (R. at 91.) Plaintiff took naps two to three times each day for one to two hours at a time. (R. at 92.)

Plaintiff testified a second time in front of the ALJ on December 19, 2011. (R. at 39.) Plaintiff indicated that she lived in a shelter with her daughter, she continued to suffer unemployment and had not collected any unemployment or other benefits. (R. at 43-45.) Plaintiff testified that she took all her medications as prescribed and had not smoked since the previous hearing. (R. at 45.) Plaintiff experienced chest pain every two to three days, lasting a few hours at a time. (R. at 47.) She treated the pain with nitroglycerine, which provided some relief. (R. at 47.)

13

E.  Third Party Function Report

On November 4, 2009, Plaintiff's friend Katrina Riley submitted a third party function report on Plaintiff's behalf. (R. at 332.) Ms. Riley indicated that she saw Plaintiff every day and knew Plaintiff for four years. (R. at 332.) Ms. Riley stated that Plaintiff's days included waking up and ensuring that her daughter would get on the bus. (R. at 333.) Plaintiff spent the rest of the day napping, but sometimes helped Ms. Riley prepare dinner. (R. at 333.) Plaintiff cared for her 13-year old daughter by keeping a watchful eye and ensuring that she had food, clothes and shoes. (R. at 333.)

Before her condition, Ms. Riley noted that Plaintiff was very active, but now she had difficulty sleeping and complained about pain. (R. at 334.) Plaintiff needed no help with her personal care and grooming, but needed reminders to take her medication. (R. at 335.) Plaintiff prepared her own meals, which consisted of mostly sandwiches, washed dishes and cleaned the countertop. (R. at 335.) Plaintiff did not like going out often, but often accompanied Ms. Riley on outings in which Plaintiff rode in the car or took public transportation. (R. at 336.) Plaintiff shopped in stores for food and her daughter's needs for about an hour. (R. at 337.) Plaintiff's condition did not affect her ability to pay bills, count change, handle a savings account or use a checkbook. (R. at 337.)

Ms. Riley listed Plaintiff's hobbies as reading, using the computer and spending time with children. (R. at 337.) Plaintiff socialized with other people a few times a week by telephone or computer and needed reminders to go places. (R. at 338.) Plaintiff had no problem getting along with others, but she sometimes suffered mood swings. (R. at 338.) Ms. Riley indicated that Plaintiff's condition affected Plaintiff's ability to lift, climb stairs, stand, walk and

reach. (R. at 338.) However, Plaintiff had no problem bending, using hands, understanding, kneeling, seeing, remembering, following instructions, squatting, sitting, hearing, concentrating, talking, completing tasks and getting along with others. (R. at 338.) According to Ms. Riley, Plaintiff could follow written and spoken instructions well and had no problem getting along with authority figures. (R. at 339.)

F. Non-Treating State Agency Physician's Opinion

On May 14, 2010, Dr. James Darden, M.D., completed a disability assessment. (R. at 129-39.) Dr. Darden determined that Plaintiff could occasionally lift twenty pounds and could frequently lift ten pounds. (R. at 136.) He also noted that Plaintiff could stand or walk six hours during an eight-hour work day and could sit for about six hours during an eight-hour work day. (R. at 136.) Plaintiff was unlimited in her ability to push and pull, and she had no postural, manipulative, visual, communicative or environmental limitations. (R. at 136.) Overall, Dr. Darden opined that Plaintiff was limited to unskilled light work without any non-exertional limitations. (R. at 137.)

G.    Testimony of the Vocational Expert

On December 19, 2011, the VE testified that an individual of Plaintiff's age, education, and work history, who was limited to sedentary simple unskilled work with occasional interactions with the general public and no concentrated exposure to temperature extremes, could perform work as a product inspector/grader, a charge account clerk and a bench assembler. (R. at 55-56.) The VE stated that jobs that meet these characteristics existed in both the national and Virginia state economy. (R. at 56-57.)

When questioned by Plaintiff's counsel, the VE testified that an individual who had difficulty dealing with supervision, production requirements, pace requirements and the inability to believe they could meet expectations would not be able to maintain work. (R. at 61-62.) The VE also testified that an individual with a limited ability to maintain the requirements of a competitive work week without interruptions from psychiatric symptoms or physical chest pain would not be able to work. (R. at 63.) Finally, the VE testified that an individual, who was absent an average of three or more times a month, would not be employable. (R. at 63.)

## II. PROCEDURAL HISTORY

On July 11, 2009, Plaintiff filed an application for SSI and DIB due to disability from coronary artery disease, chronic heart failure and depressive disorder. (R. at 145.) The alleged onset date of Plaintiff's disability was May 1, 2009. (R. at 22.) Plaintiff's claim was denied initially on February 17, 2010, and again on reconsideration on May 14, 2010. (R. at 145.) Plaintiff filed a written request for hearing on May 16, 2010, and appeared before an ALJ on May 11, 2011, represented by counsel. (R. at 145.) On May 27, 2011, the ALJ denied claimant benefits. (R. at 145.) On appeal, the Appeals Council remanded the claim to the ALJ with directions to give consideration to the Plaintiff's maximum RFC during the entire period at issue and provide rationale with specific references to evidence in the record in support of assessed limitations. (R. at 22.) Plaintiff again appeared before the ALJ on December 19, 2011, represented by counsel. (R. at 22.) On February 9, 2012, the ALJ denied Plaintiff benefits, finding both her testimony and the opinions of her treating physicians not credible. (R. at 22, 27, 29.) On June 20, 2012, the Appeals Council denied Plaintiff's request for review, making the

ALJ's decision the final decision of the Commissioner subject to judicial review by this Court.

(R. at 1-3.)

## III. QUESTION PRESENTED

1. Did the ALJ err in assigning Plaintiff's treating physicians' opinions less than controlling weight and, therefore, err in determining whether Plaintiff maintained the ability to perform sedentary work?

2. Was the ALJ's assessment of Plaintiff's credibility supported by substantial evidence in the record and determined by the application of the correct legal standard?

3. Did the hypothetical posed to the Vocational Expert account for all of Plaintiff's impairments?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted). To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "'undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ].'" *Hancock*, 667 F.3d at 472 (quoting *Johnson*, 434 F.3d at 653). In considering the decision of the Commissioner based on the record as a whole, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting

17

*Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)). The Commissioner's findings as to any fact — if the findings are supported by substantial evidence — are conclusive and must be affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667 F.3d at 477 (citation omitted). If the ALJ's determination is not supported by substantial evidence on the record or if the ALJ has made an error of law, the Court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2000). The analysis is conducted for the Commissioner by the ALJ and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity" ("SGA").[6] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that he did not engage in SGA, the second step of the

---

[6] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like, are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

analysis requires him to prove that he has "a severe impairment . . . or combination of impairments which significantly limit[s] [his] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to his past relevant work[7] based on an assessment of the claimant's RFC and the "physical and mental demands of work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that he must prove that his limitations preclude him from past relevant work. *Bowen v. Yuckert,* 482 U.S. 137, 146 n.5 (1987); *Hancock,* 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform his past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in

---

[7]     Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Hancock*, 667 F.3d at 472-73; *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146, n.5). The Commissioner can carry his burden in the final step with the testimony of a Vocational Expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

## V. ANALYSIS

A.     The ALJ's Decision

Plaintiff appeared before the ALJ for a hearing on December 19, 2011. (R. at 22, 39.) An impartial VE also appeared at the hearing. (R.at 22.) On February 8, 2012, the ALJ rendered his decision in a written opinion and determined that, based on the application for DIB and SSI filed on July 11, 2009, Plaintiff was not disabled under §§ 216(i) and 223(d) of the Social Security Act. (R. at 31.)

The ALJ followed the five-step sequential evaluation process as established by the Social Security Act in analyzing whether Plaintiff was disabled. (R. at 23.); *see also* 20 C.F.R. § 404.1520(a). First, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. (R. at 24.) At step two, the ALJ determined that Plaintiff

20

suffered severe impairments in the form of coronary artery disease, chronic heart failure and depressive disorder. (R. at 24.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 404.920(d), 416.925, 416.926.

At step four, the ALJ determined that Plaintiff had the residual functioning capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she must avoid concentrated exposures to temperature extremes and be limited to simple, unskilled work with only occasional interaction with the general public. (R. at 26.) In reaching this conclusion, the ALJ considered objective medical evidence and opinion evidence. (R. at 26-27.) The ALJ followed a two-step analysis of whether the medically determinable physical symptoms could reasonably be expected to produce Plaintiff's pain and symptoms, and if so, the extent to which the symptoms limit Plaintiff's functioning. (R. at 27.) The ALJ concluded that, based on the evidence, Plaintiff's impairment could reasonably be expected to cause the alleged symptoms, but found Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms to lack credibility. (R. at 27.) Finally, at step five of the analysis, the ALJ concluded that, based on Plaintiff's age, education, and work experience, a significant number of jobs existed in the national economy that Plaintiff could perform. (R. at 31.)

Plaintiff moves for a finding that she is entitled to benefits as a matter of law, or in the alternative, she seeks reversal and remand for additional administrative proceedings. (Pl.'s Mem. at 21.) Specifically, Plaintiff challenges the weight assigned to Plaintiff's treating physicians' opinions and the ALJ's assessment of Plaintiff's credibility. (Pl.'s Mem. at 11, 15.)

21

Plaintiff also challenges the ALJ's decision at step five, arguing that the ALJ relied upon flawed vocational expert testimony. (Pl.'s Mem. at 19.) Defendant asserts that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 18.)

B.     The ALJ did not err in applying the Treating Physician Rule.

Plaintiff challenges the ALJ's decision to afford the opinions of Dr. Saiyed "little weight," arguing that it violates the treating physician rule. (Pl.'s Mem. at 12-14.) Likewise, she challenges the ALJ's decision to afford little weight to Dr. Kelly's opinion. (Pl.'s Mem. at 14-15.) On both points, Defendant responds that the ALJ's determination was supported by substantial evidence. (Def.'s Mem. at 14-17.)

During the sequential analysis, when the ALJ determines whether the claimant has a medically determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. 20 C.F.R. § 404.1527(d)(3)-(4), (e); *Jarrells v. Barnhart*, No. 7:04cv411, 2005 U.S. Dist. LEXIS 7459, at *9-10 (W.D. Va. Apr. 26, 2005).

The ALJ is required to consider the following when evaluating a treating physician's opinions: (1) the length of the treating physician's relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record; (5) any specialization on the part of the treating physician; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(d)(2)-(6). However, those same regulations specifically vest the ALJ – not the treating physicians – with authority to determine whether a claimant is disabled as that term is defined by statute. 20 C.F.R. § 404.1527(e)(1).

Here, in finding a RFC that enabled Plaintiff to engage in sedentary work, the ALJ was forced to reconcile divergent opinions offered by Plaintiff's treating physicians and those offered by state agency physicians. Ultimately, the ALJ gave little weight to all three medical opinions and controlling weight to none. (R. at 29.)

23

1. Dr. Saiyed's Opinion

Plaintiff argues that the ALJ erred in according little weight to Dr. Saiyed's opinion. (Pl.'s Mem. at 12.) Specifically, Plaintiff argues that Dr. Saiyed's opinions were "well-supported by clinical and objective medical findings" and because they were "uncontradicted by any other opposing substantial evidence, [Dr. Saiyed's] opinions should be given controlling weight." (Pl.'s Mem. at 13.) Defendant argues that substantial evidence supported the ALJ's determination of the weight assigned to Dr. Saiyed's opinion. (Def.'s Mem. at 16-17.)

The ALJ assigned Dr. Saiyed's opinion little weight, because his assessment was inconsistent with Plaintiff's treatment notes. (R. at 29.) Specifically, the ALJ emphasized that "[t]he assessed GAF score in his opinion is inconsistent with the one contained in the [Plaintiff's] treatment notes." (R. at 29.) On May 17, 2010, at the time of their first meeting, Dr. Saiyed assigned Plaintiff a GAF of 55.[8] (R. at 798.) Approximately two months later, when Dr. Saiyed filled out the Psychiatric/Psychological Impairment Questionnaire at the request of Plaintiff's attorney, she assigned Plaintiff a GAF of 50.[9]

Plaintiff correctly notes that a GAF score in and of itself is not determinative of severity or disability for social security purposes. (Pl.'s Mem. at 1; see 65 Fed. Reg. 50746, 50764-5 (2000).) But the ALJ did not use the GAF score alone to make his determination. Instead, the

---

[8]     A GAF of 55 falls within a range of "moderate symptoms," characterized by "flat affect and circumstantial speech or occasional panic attacks" or "moderate difficulty in social, occupational, or school functioning," characterized by having "few friends" or experiencing "conflicts with peers or co-workers." DSM-IV-TR 34 (American Psychiatric Association 2000).

[9]     A GAF of 50 falls at the high end of a range of "serious symptoms," which include "suicidal ideation, severe obsessional rituals, or frequent shoplifting," or "any serious impairment in social, occupational, or school functioning," possibly indicated by a lack of friends or the inability to keep a job. DSM-IV-TR 34 (American Psychiatric Association 2000).

ALJ determined that Dr. Saiyed's assessment of a reduced GAF from May to August 2011 was inconsistent with her treatment notes. (R. at 29.)

Substantial evidence supports the ALJ's finding that Dr. Saiyed's assessment and the lower GAF is inconsistent with Plaintiff's treatment notes. Between Dr. Saiyed's GAF assessments, she met with Plaintiff three times. On June 15, 2010, Dr. Saiyed noted that while Plaintiff still felt anxious, her symptoms had improved. (R. at 799.) On July 15, 2010, Dr. Saiyed noted no changes in Plaintiff's condition. (R. at 799.) On August 19, 2010, the same day that Dr. Saiyed completed the Questionnaire, she noted that Plaintiff's symptoms continued to improve. (R. at 803.) Dr. Saiyed's treatment notes showed that over the course of her four-month treatment of Plaintiff, Plaintiff's condition improved, but Dr. Saiyed's opinion indicated that Plaintiff's GAF worsened. Therefore, the ALJ did not err in determining that Dr. Saiyed's downward GAF assessment was inconsistent with her treatment records.

Further, Dr. Saiyed opined that Plaintiff suffered poor memory, difficulty thinking or concentrating, hostility and irritability, and that Plaintiff was mildly limited in her ability to carry out simple one or two-step instructions and to carry out detailed instructions. (R. at 787-89.) Dr. Saiyed indicated that Plaintiff was moderately limited in her ability to: (1) remember locations and work-like procedures, (2) understand and remember one or two-step instructions, (3) understand and remember detailed instructions, (4) work in coordination with or proximity to others without being distracted by them, (5) complete a normal workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length or rest periods, (6) ask simple questions or request assistance, (7) accept

25

instructions and respond appropriately to criticism from supervisors, and (8) respond appropriately to changes in the work setting. (R. at 789-90.)

Substantial evidence throughout the record supports the ALJ's determination that Dr. Saiyed's assessment was inconsistent with other evidence. Plaintiff herself testified that she maintained her ability to read, write and use a telephone. (R. at 85.) Plaintiff's activities of daily living indicate that Plaintiff took care of her 13-year old daughter. (R. at 365.) Plaintiff shopped in stores and online for food and clothes for two and a half hours at a time. (R. at 366.) Plaintiff could count change, handle a saving account and use a checkbook. (R. at 368.) Plaintiff's condition did not affect her ability to talk, remember, complete tasks, concentrate, understand or follow instructions. (R. at 370.) Plaintiff could finish what she started and she was "alright" at following written and spoken instructions. (R. at 370.) Plaintiff's friend, Ms. Riley, indicated that Plaintiff had no problem understanding, remembering, following instructions, concentrating, talking, completing tasks and getting along with others. (R. at 338.) According to Ms. Riley, Plaintiff could follow written and spoken instructions well and had no problem getting along with authority figures. (R. at 339.) Because substantial evidence supports the ALJ's determination that Plaintiff's patient notes and the record are inconsistent with Dr. Saiyed's opinion, the ALJ did not err in affording little weight to Dr. Saiyed's opinion.

2. Dr. Kelly's Opinion

Plaintiff argues that the ALJ erred in affording little weight to Dr. Kelly's opinion. (Pl.'s Mem. at 14.) Plaintiff concedes that the ALJ was correct in comparing Plaintiff's NYHA rating assigned by Dr. Kelly with the treatment notes, but argues that the treatment record does not conflict with the rating. (Pl.'s Reply (ECF No. 13) at 2.) Defendant argues that substantial

evidence supported the ALJ's determination of the weight assigned to Dr. Kelly's opinion. (Def.'s Mem. at 15-16.)

The ALJ noted that he assigned Dr. Kelly's opinion little weight, because his opinion was inconsistent with Plaintiff's treatment notes. (R. at 29.) The ALJ emphasized that "there is no mention of the class rating of her heart condition" in the treatment notes, but Dr. Kelly opined that Plaintiff's cardiac disease registered at NYHA functional classification III. (R. at 29, 805.) A NYHA functional classification III denotes a patient "with cardiac disease resulting in marked limitation of physical activity" and who is "comfortable at rest," but "less than ordinary activity causes fatigue, palpitation, dyspnea or anginal pain." *See supra* note 2.

Nothing within Dr. Kelly's medical notes indicate that Plaintiff's cardiac problems limited Plaintiff's physical activities. During Plaintiff's August 31, 2011 appointment, Dr. Kelly attributed Plaintiff's chest pain to emotional distress. (R. at 831.) While Plaintiff was ordered to undergo a new stress test (but failed to do so), Dr. Kelly noted that it was "impossible to comment on any cardiac issues regarding disability unless Plaintiff underwent a stress test" and Dr. Kelly did not think that Plaintiff's pain was related to Plaintiff's cardiac condition. (R. at 829-830.) Plaintiff's original stress test from December 2009 was inadequate to make a finding. (R. at 645.) As such, Dr. Kelly's assessment of Plaintiff's NYHA rating is not supported by the record.

Moreover, even if the medical records did not support the ALJ's finding, Dr. Kelly's opinion is inconsistent with the record as a whole. Plaintiff indicated that her condition did not affect her ability to squat, reach, walk, sit or kneel. (R. at 370.) Her friend, Ms. Riley, noted that Plaintiff had no problem bending, using her hands, kneeling, squatting or sitting. (R. at 338.)

The non-treating state agency physician opined that Plaintiff could lift twenty pounds on occasion and lift ten pounds frequently. (R. at 136.) Plaintiff could also walk or stand for about six hours and sit for about six hours during an eight-hour work day. (R. at 136.) Therefore, substantial evidence supports the ALJ's determination to give Dr. Kelly's opinion less than controlling weight.

Because the ALJ was correct in his analysis to afford little weight to the treating physicians' opinion and gave only little weight to the non-treating state agency physician, the Court must determine if substantial medical opinion supported the ALJ's determination that Plaintiff had the RFC "to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a), except that she must avoid concentrated exposures to temperature extremes" is supported by substantial evidence (R. at 26.) Plaintiff argues that the ALJ incorrectly determined Plaintiff's RFC, because the ALJ disregarded the medical evidence and offered his own lay person determination of Plaintiff's RFC. (Pl's Mem. at 15.)

Here, the ALJ was presented with three different medical opinions offering three different RFCs. Given the conflicting medical evidence, the ALJ was certainly permitted to assign different levels of weight to each of the opinions. However, an ALJ is "not at liberty to ignore medical evidence or substitute his own views for uncontroverted medical opinion." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir.1999). Where "no medical opinion" supports the ALJ's RFC determination, as a "lay person" he is "simply not qualified to interpret raw medical data in functional terms." *Id.*

The ALJ concluded that Plaintiff retained a RFC to perform at most sedentary work, while the different medical experts opined that she could perform either no work or, at most,

light work. (R. at 26.) Sedentary work requires "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a); 20 C.F.R. §416.967(a). "Jobs are sedentary if walking and standing are required occasionally." *Id.*

The ALJ did not disregard the medical opinions and determine his own interpretation. Instead, the medical opinions and evidence support the ALJ's determination that Plaintiff could perform sedentary work. The non-treating state agency physician opined that Plaintiff could lift twenty pounds on occasion and lift ten pounds frequently. (R. at 136.) Plaintiff could also walk or stand for about six hours and sit for about six hours during an eight-hour work day. (R. at 136.) Plaintiff's conditions did not affect her ability to squat, reach, walk, sit or kneel. (R. at 370.) Accordingly, the ALJ's determination that Plaintiff could perform sedentary work is supported by substantial evidence and the ALJ did not err in determining Plaintiff's RFC.

C.     The ALJ did not err when he assessed Plaintiff's credibility.

Plaintiff argues that the ALJ applied the incorrect standard in determining Plaintiff's credibility. (Pl.'s Mem. at 17-18.) Defendant maintains that the ALJ's credibility determination was supported by substantial evidence. (Def.'s Mem. at 18.) In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Craig*, 76 F.3d at 594; SSR 96-7p, at 1-3. In doing so, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5 n.3; *see also* SSR 96-8p, at 13.

If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the Plaintiff's impairments and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms. The ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

The ALJ considered all of the evidence regarding Plaintiff's symptoms in compliance with SSR 96-7p, including Plaintiff's medical records, Plaintiff's testimony and third party functioning reports. (R. at 27.) The ALJ determined that Plaintiff's underlying medical impairments could reasonably be expected to produce her alleged symptoms. (R. at 27.) However, the ALJ did not find Plaintiff's statements concerning the intensity, persistence and limiting effects of her condition credible to the extent that they were inconsistent with Plaintiff's ability to perform sedentary work with previously-discussed qualifications. (R. at 27.) While Plaintiff takes umbrage with the ALJ's boilerplate language, (*see* Pl.'s Mem. at 18), as long as substantial evidence supported the conclusion, this Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997).

Objective medical evidence supports the ALJ's finding. Dr. Saiyed's treatment notes indicate consistent improvement in Plaintiff's mental and emotional health over her short period of treatment. (R. at 799, 803, 822.) Additionally, during Plaintiff's first appointment with Dr. Saiyed on May 17, 2010, Plaintiff admitted to smoking marijuana every day since age thirteen, but testified that she had not used any drugs since June 1, 2009. (R. at 89, 796.) Further,

medical records reflected that Plaintiff failed to comply completely with Dr. Saiyed's treatment plan. (R. at 821.)

Plaintiff indicated in her function report that her ability to walk and sit was not affected by her condition. (R. at 370.) Ms. Riley's third person function report indicated that Plaintiff cared for her daughter and Plaintiff required no special reminders to take care of personal needs and grooming. (R. at 333-335.) Ms. Riley reported that Plaintiff prepared simple meals and performed simple chores like washing dishes and wiping down counters. (R. at 335.) Plaintiff could shop for food and she experienced no problems handling money or paying bills. (R. at 337.) Finally, Ms. Riley's report indicated that Plaintiff's condition did not affect Plaintiff's ability to pay attention, understand, follow instructions, sit, kneel or complete tasks. (R. at 338.) Plaintiff could follow both written and spoken instructions, and she could get along well with authority figures. (R. at 339.) Therefore, because substantial evidence supported the ALJ's credibility assessment, the ALJ did not err.

D.    The ALJ did not err in relying upon the VE's testimony.

Plaintiff argues that the ALJ relied upon flawed VE testimony. First, Plaintiff argues that the VE's testimony was based upon a flawed RFC, because the ALJ's RFC was incorrectly determined. (Pl.'s Mem. at 19.) Second, Plaintiff argues that the hypothetical posed to the ALJ is flawed because the treating physicians' opinions posed restrictions that supported alternative hypothetical questions for the VE. (Pl.'s Mem. at 20.) Finally, Plaintiff contends that the ALJ failed to present a hypothetical question that accurately accounted for Plaintiff's mental limitations. (Pl.'s Mem. at 20.) Defendant responds that the ALJ did not err in relying upon the VE's testimony. (Def.'s Mem. at 20.)

At the fifth step in the sequential analysis, the ALJ must determine whether a claimant can perform any other work available in significant numbers in the national economy, considering the claimant's age, education and past work experience. 20 C.F.R. §§ 404.1566, 416.966. Step five is reached when the claimant is not engaged in substantial gainful activity and has a severe impairment that does not meet or equal the listings, but nevertheless prevents a claimant from performing past relevant work. In assessing a claimant's ability to perform other work within the economy, the ALJ will look at exertional limitations — those limitations or restrictions which impact non-strength activities such as concentration and the ability to follow instructions. 20 C.F.R. §§ 404.1569, 416.969. At step five, the burden of proof shifts to the Commissioner to establish that claimant has the ability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

If the claimant cannot perform her past relevant work, the ALJ may rely on the testimony of a VE to determine whether jobs exist in significant number that the claimant could perform, usually by posing a hypothetical question. When relying on VE testimony based on hypothetical questions, the hypotheticals posed must account for all of the claimant's limitations as shown by the record. *Walker v. Bowen*, 889 F.2d 47, 50-51 (4th Cir. 1989). If limitations are omitted, the VE's testimony is of limited value and may not constitute substantial evidence. *Johnson v. Barnhard*, 206 F. Supp. 2d 757, 767 (4th Cir. 2006) (citing *Walker*, 889 F.2d at 50). Failing to consider limitations shown by the evidence and then relying upon the errant hypothetical to form an opinion about the availability of work suitable to the claimant is error. *Hancock v. Barnhart*, 206 F.Supp.2d 757, 767 (W.D. Va. 2002). "However, the ALJ need only include in his questioning those impairments which he has found to be credible. If an ALJ does not believe

32

that the claimant suffers from a[n] alleged impairment — and if substantial evidence supports

such a conclusion — then the ALJ is not required to include that impairment in questioning the

VE." *Wilkerson v. Astrue*, 2011 WL 3951165 (E.D.N.C. Aug. 19, 2011).

In this case, the ALJ determined that Plaintiff was unable to perform past relevant work,

but had the RFC to perform sedentary work, except that she must avoid concentrated exposures

to temperature extremes and is limited to simple, unskilled work with only occasional interaction

with the general public. (R. at 26, 30.) Based on this RFC determination, the ALJ asked the VE

the following hypothetical:

> I'm [going to] give you a hypothetical of an individual the same age category as
> the [Plaintiff] which is a younger individual, same educational level as the
> [Plaintiff] with the same work history as the [Plaintiff], limited with the following
> RFC to sedentary work. Limited to simple, unskilled work, so SVP [of] 1 or 2,
> with occasional interaction with the general public and avoid concentrated
> exposure to temperature extremes. Are there jobs in the national, regional, state,
> or local economies that can be performed with that RFC?

(R. at 56.) The VE described several such jobs which a person with Plaintiff's age, education,

work history and limitations could perform, including charge account clerk and bench work

assembler. (R. at 56-57.)

As discussed above, the ALJ's RFC was supported by substantial evidence and

substantial evidence supported the ALJ's decision to afford the treating physicians' opinions less

weight. Therefore the hypothetical served as an appropriate basis for the VE's testimony on

these grounds.

Regarding Plaintiff's argument that the VE failed to take into account Plaintiff's mental

limitations, Plaintiff argues that her "moderate difficulties in concentration, persistence or pace

and in social functioning" were not represented within the hypothetical. (Pl.'s Mem. at 20.)

33

However, in light of case law, Plaintiff's argument flat out fails. Numerous courts have held that a hypothetical that includes limits to simple, routine, repetitive tasks adequately accounts for a claimant's deficiencies in concentration, persistence and pace. *Manning v. Astrue*, 2012 WL 3638553 at \*15 (E.D. Va. May 11, 2012); *Parker v. Astrue*, 792 F. Supp. 2d 886, 896 (E.D.N.C. 2011) (citing *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001)). Therefore, the ALJ's hypothetical which included a limitation to simple unskilled work accounted for Plaintiff's limitations in concentration, persistence, pace and social functioning. Because the ALJ's hypothetical to the VE accurately conveyed all of the limitations of Plaintiff's RFC, the ALJ did not err in relying upon the VE's testimony that other work existed in the economy that Plaintiff could perform.

## VI. CONCLUSION

Based on the foregoing analysis, it is the recommendation of this Court that Plaintiff's Motion for Summary Judgment (ECF No. 7) be DENIED; that Plaintiff's Motion to Remand (ECF No. 8) be DENIED; that Defendant's Motion for Summary Judgment (ECF No. 12) be GRANTED; and, that the final decision of the Commissioner be AFFIRMED.

Let the Clerk file this Report and Recommendation electronically and forward a copy to the Honorable Robert E. Payne with notification to all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure**

shall bar you from attacking on appeal the findings and conclusions accepted and adopted

by the District Judge except upon grounds of plain error.

/s/

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: July 3, 2013

35